## DETERMINED IN THE

# SUPREME COURT

### OF

# WASHINGTON

[No. 14577. *En Banc.* January 22, 1919.]

 OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY, *Appellant,* v. SEATTLE GRAIN COMPANY, *Respondent.*[1]

CARRIERS (7)—SALES—CONTRACTS IN VIOLATION OF REGULATIONS— ACTION FOR UNDERCHARGE. Under Rem. & Bal. Code, §§ 8627-8661, requiring common carriers of interstate freight to establish and maintain uniform freight rates, to be published and filed with the state railroad commission and kept for inspection at each station, a complaint showing compliance therewith and that by inadvertence an undercharge had been made, states sufficient facts to constitute a cause of action by the carrier against the shipper to recover the amount of the undercharge.

LIMITATION OF ACTIONS (15, 16)—WRITTEN CONTRACTS. An action by a common carrier against a shipper to recover the difference between charges made for a shipment for which bill of lading was issued and the amount the carrier was required to charge by its published tariff schedules, is an action upon a written contract or upon a liability express or implied arising out of the contract, within Rem. Code, § 157, limiting the same to six years after the cause shall have accrued; notwithstanding the bill of lading did not name the sum to be paid for the carriage other than by reference to the published tariffs (CHADWICK, C. J., and HOLCOMB, J., dissenting).

Appeal from a judgment of the superior court for King county, Tallman, J., entered November 7, 1917,

[1]Reported in 178 Pac. 648.

NOTE: Withheld from publication pending rehearing.—REP.

upon sustaining a demurrer to the complaint, dismissing an action by a carrier to recover freight charges. Reversed.

*Bogle, Graves, Merritt & Bogle,* for appellant.

*Ballinger, Battle, Hulbert & Shorts,* for respondent.

*Kerr & McCord, Stephen V. Carey, Higgins & Hughes (Hyman Zettler,* of counsel), *amicus curiae.*

FULLERTON, J.—In this action the appellant, a common carrier by railroad, seeks to recover from the respondent, a shipper over its line of railroad, the difference between certain charges made for carrying freight and the sums it was required to charge by its printed and published tariff schedules. A demurrer to the complaint, based on the grounds that facts sufficient to constitute a cause of action were not stated and that the action was not commenced within the time limited by law, was interposed and sustained by the court. From a judgment of dismissal, entered after the appellant had elected to stand on its complaint and refused to plead further, this appeal is prosecuted.

The complaint sets forth two causes of action, separately stated. The first was, in substance, this: The appellant owns and operates a line of railroad which extends from Thornton, in the State of Washington, to Seattle, in the same state, the road passing in the course of its route into the state of Oregon. It also has a line extending from Thornton to Spokane, Washington, where it connects with the road of the Northern Pacific Railway Company, which extends from that point to Seattle. On May 29, 1911, the respondent, through its agent, delivered to the appellant, for carriage from Thornton to Seattle, a certain quantity of wheat, for which it paid as freight the sum of $482.23. The wheat was carried by appellant over the route

first mentioned, that is, by its line of railway passing into the state of Oregon, and duly delivered to the respondent at its point of destination. For more than thirty days prior to the time the wheat was consigned for transportation, and at such time, the appellant had caused "to be duly issued, filed with the interstate commerce commission, and posted at the stations from which the same applied, all as provided by law, its certain tariff, known and designated as Tariff 3 A, I. C. C. 1495, and that the said tariff so published, filed and posted as aforesaid, prescribed the only lawful charges for the transportation of wheat" which the appellant was permitted by law to exact. The Northern Pacific Railway Company also had a tariff rate, published, filed and posted in the same manner, fixing the lawful rate for the transportation of wheat from Spokane to Seattle. The tariff rate for the transportation of wheat from Thornton to Spokane over the appellant's line of railway, and the tariff rate over the Northern Pacific Railway Company's line of railway from Spokane to Seattle, aggregated twenty-two cents per bushel; and while the tariff rate over the line on which the wheat was actually carried was greater than this combined rate, it is alleged that the respondent, inasmuch as it did not designate the route over which the wheat was to be carried, was entitled to the lesser rate. The lawful tariff at this lesser rate for the number of bushels carried was $624.07. Deducting from this sum the amount actually paid leaves a balance of $141.84, and for this sum, judgment is demanded in this cause of action.

The second cause of action was for the transportation of wheat between the same points, consigned for transportation on May 31, 1911. It is alleged that, for the carriage of this wheat, the respondent paid the appellant the sum of $354.25; that it afterwards de-

manded a refund of $150.10, claiming that the appellant had charged it this sum in excess of its lawful tariff rates; that the appellant, believing the claim to be correct, paid the same, and afterward ascertained that the amount refunded was in excess of a proper refund in the sum of $60.05, and for this sum demanded judgment.

At the time the wheat was delivered to the carrier for transportation, it delivered to the respondent straight bills of lading therefor, in conformity with § 3386 of Rem. & Bal. Code. The bills of lading were signed by both the agent of the consignee and the appellant. By them the appellant agreed to carry the grain to the place of destination named therein, subject to the conditions stated therein, "which are agreed to by the shipper and accepted for himself and his assigns." No tariff rate is specifically named in the bills of lading, but it is recited in each of them that the property is received "subject to the classification and tariffs in effect on the date" of its issue, and one of the conditions is that the "owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery."

The first ground of demurrer questions the sufficiency of the facts. Had the transportation of the grain been interstate, there would have been but little, if any, room for dispute upon the question. By the Federal statute relating to interstate commerce, common carriers of interstate freight are required to prepare a uniform tariff schedule, publish the same by filing it with the interstate commerce commission and posting copies thereof at all stations where freight is received for transportation, and charge in accordance with such published rate. Speaking of the effect and purport of the act, the supreme court of the United

States has said that neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper; that the published rate is that which the carrier must exact and the shipper must pay, and has allowed recovery on the part of the shipper when an overcharge has been made, and recovery on the part of the carrier where there has been an undercharge. But the present shipment was an intrastate shipment, and the Federal statutes were not wholly applicable. The state statute then in force, however, contained provisions similar in their purport to the Federal statute. Common carriers of intrastate freight were required to establish and maintain uniform freight rates, applicable to all persons similarly situated, and were required to publish such rates by filing the same with the state railroad commission and keep at each station a copy thereof for the inspection of interested persons. Rem. & Bal. Code, §§ 8627-8661. Seemingly, the rules governing the rights of the parties under the one statute would be applicable under the other, and if a recovery may be had by the carrier for an undercharge under the Federal statute, it is entitled to a like recovery under the statute of the state. There is enough in the complaint, sufficient as against a general demurrer, at least, to show that the appellant carrier was maintaining a uniform rate for the transportation of freight, and that, through inadvertence, it made an undercharge in the instances of the shipments in question. Following the Federal rule, we hold that a complaint reciting these facts states facts sufficient to constitute a cause of action.

The second ground of demurrer, whether the action was commenced within the time limited by law, is the ground to which the arguments of the parties have been principally directed. The action was commenced more than five years, but less than six years, after the

cause of action accrued, and the trial court held that this was too late. The applicable statutes are found at §§ 155, 157, 159. and 165 of Rem. Code, the pertinent portions of which we quote:

"§ 155. Actions can only be commenced within the periods herein prescribed after the cause of action shall have accrued. . . ."

"§ 157. Within six years, . . . (2) An action upon a contract in writing, or liability express or implied arising out of a written agreement;".

"§ 159. Within three years, . . . An action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument;".

"§ 165. An action for relief not hereinbefore provided for shall be commenced within two years after the cause of action shall have accrued."

It is manifest, therefore, that the right to maintain the action at this time hinges upon the nature of the liability sued upon. If the action is one founded upon a contract in writing, or upon a liability, express or implied, arising out of a written agreement, the action is in time, otherwise it falls within one of the other of the subsequent statutes from which quotations are made, and is barred by them. It will be remembered from the statement that bills of lading were issued on the consignment of the grain for shipment, signed by both the consignee and the shipper, which expressed the terms of the shipment, save that it did not express the amount to be paid therefor, further than to say that it should be in accordance with the established rates. Instruments of this sort, when they express the consideration to be paid, are uniformly held to be contracts. Speaking of such an instrument, Mr. Justice Miller, in *Pollard v. Vinton,* 105 U. S. 7, used this language:

"A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. . . . It is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property, . . . In the latter it is a contract to carry safely and deliver."

And in the earlier case of *The Delaware,* 14 Wall. (81 U. S.) 579, it was said:

"Beyond all doubt a bill of lading, in the usual form, is a receipt for the quantity of goods shipped and a promise to transport and deliver the same as therein stipulated. Receipts may be either a mere acknowledgment of payment or delivery, or they may also contain a contract to do something in relation to the thing delivered. In the former case, and so far as the receipt goes only to acknowledge payment or delivery, it, the receipt, is merely *prima facie* evidence of the fact, and not conclusive, and therefore the fact which it recites may be contradicted by oral testimony, but in so far as it is a contract between the parties, it stands on the footing of all other contracts in writing, and cannot be contradicted or varied by parol evidence."

See, also, *Georgia, F. & A. R. Co. v. Blish Milling Co.,* 241 U. S. 190; *Elder, Dempster & Co. v. St. Louis Southwestern R. Co.,* 105 Tex. 628, 154 S. W. 975.

Our attention has been called to no case from our own court wherein we have directly held bills of lading to be contracts, yet we have numerous cases wherein they have been spoken of and treated as such. *First Nat. Bank of Pullman v. Northern Pac. R. Co.,* 28 Wash. 439, 68 Pac. 965; *Allen & Gilbert-Ramaker Co. v. Canadian Pac. R. Co.,* 42 Wash. 64, 84 Pac. 620; *Roy & Roy v. Northern Pac. R. Co.,* 42 Wash. 572, 85 Pac. 53, 6 L. R. A. (N. S.) 302; *Bonds-Foster Lumber Co. v. Northern Pac. R. Co.,* 53 Wash. 302, 101 Pac.

877; *Coovert v. Spokane, Portland & Seattle R. Co.*, 80 Wash. 87, 141 Pac. 324; *Southern Pac. Co. v. Frye & Bruhn*, 82 Wash. 9, 143 Pac. 163.

Since the bill of lading is a contract, it is, of course, a contract in writing, and any action upon the contract, or any action upon a liability, express or implied, arising out of the contract, is within the statute if commenced within six years from the time the cause of action accrued, unless the circumstances that the contract does not specifically name the sum to be charged for the carriage, but provides that the sum to be paid shall be the statutory rate, changes the nature of the liability from one on contract, or one arising out of contract, to a liability created by law. It seems clear to us that it does not have this effect. A liability created by statute is one in which no element of agreement enters. It is an obligation which the law creates in the absence of an agreement. But the present liability is not of this sort. The law but fixes the rate to be charged when a contract of carriage is made. In other words, the law does not create the liability; it but determines the amount of the liability created by the express contract of the parties. As such, it is not a liability created by statute. It is a liability arising out of the contract which the parties have by their writing expressed.

It is said, and it is doubtless true, that the liability for the particular shipment would have been the same had there been no express written contract entered into with reference to the terms of the shipment. But this does not argue that such an express contract is void, nor does it argue that a different limitation for the commencement of an action thereon must be applied than is usually applied to express written contracts. By statute in this state, in force at the time the shipment in question was made, bills of lading

expressing the terms of the shipment were permissible, and, under the then existing business custom, such contracts were usual, if not universal. Where an express contract exists, a party suing for its breach may declare upon the express contract, and the statute of limitations applicable to such contracts will be applied, even though he might have declared upon the duty imposed by law. The form of contract the parties adopt, that is to say, whether they put it into writing or not, determines the period of limitation. It is not affected by the fact that the contract would have been valid if not expressed in writing.

Many instances of written agreements can be cited in which the law furnishes one of the terms of the agreement, and which are nevertheless regarded in law as contracts in writing within the meaning of the statute of limitations. It is sufficient to mention the familiar instance of a promissory note which names no date of payment. In such a note the law adjudges it to be due immediately, so conclusive, indeed, as to prohibit parol evidence of a different time of payment agreed upon between the parties at the time of its execution. Manifestly here the law forms one of the terms of the agreement, yet there is no case, in so far as our researches go, which has held that it is a contract created by law, or that a different period of limitations bars an action upon such a note than the period fixed by statute as a limitation upon contracts in writing.

No case from a court of last resort, where the precise question at bar was presented, has been discovered by the diligence of counsel. A case in point, however, is cited from the court of appeals in Georgia, *Seaboard Air-Line R. v. Luke,* 19 Ga. App. 100, 90 S. E. 1041. In that case the railway company had shipped for the respondent a car-load of automobiles,

for which an undercharge had been made on the
freight rate as fixed by the terms of the law regulat-
ing interstate commerce.  The defense was that the
action was barred by the statute of limitations, the
question being whether the action was founded upon a
contract in writing or was a contract implied by law.
Passing upon the question, the court of appeals said:

"Section 4361 of the Civil Code provides that 'All
actions upon promissory notes, bills of exchange, or
other simple contracts in writing shall be brought
within six years after the same become due and pay-
able.'  A bill of lading is a written contract.  *McEl-
veen v. Southern Railway Co.*, 109 Ga. 249 (34 S. E.
281, 77 Am. St. R. 371); 1 Hutchinson on Carriers
(3d ed.), § 157.  The particular bill of lading in this
case provides as follows:  'It is mutually agreed as
to each carrier of all or any of said property over all
or any portion of said route to destination, and as to
each party at any time interested in all or any of said
property, that every service to be performed hereun-
der shall be subject to all the conditions, whether
printed or written, herein contained (including con-
ditions on back hereof) and which are agreed to by
the shipper and accepted for himself and assigns.'  On
the back of this bill of lading is the following provi-
sion:  'Sec. 8.  The owner or consignee shall pay the
freight, and average, if any, and all other lawful
charges accruing on said property.'  Under this con-
tract it is clear that the consideration thereof, as re-
gards the railroad company, was the freight to be paid
for the transportation of the shipment, and that the
obligation to pay this freight was in writing.  The ob-
ligation to pay the legal rate of freight is binding, un-
der the provisions of the bill of lading, irrespective of
whether or not the specific rate of freight is stated in
the bill of lading, since it is stated therein that it is
received subject to the classifications and tariffs in
effect on the date of its issue.  Upon an interstate
shipment the freight charges for the transportation of
the goods are fixed by the schedule of rates and joint
tariffs filed and posted in accordance with the act of

Congress of June 29, 1906, known as the 'Hepburn
act'; and though a common carrier, by mistake or
otherwise, delivers goods upon the payment of a lower
rate than that stated in the schedules, the carrier may
thereafter demand of the shipper the difference be-
tween the rate collected and that which should have
been collected, and upon his refusal to pay may main-
tain an action therefor. *Georgia Railroad v. Greety,*
5 Ga. App. 424 (63 S. E. 528); *Central of Georgia Ry.
Co. v. Curtis,* 14 Ga. App. 716 (82 S. E. 318); *Great
Northern Ry. Co. v. O'Connor,* 232 U. S. 508 (34 Sup.
Ct. 380, 58 L. Ed. 703). Under these authorities it is
clear that the amount to be paid for freight charges
on every shipment is absolutely fixed, not by the rate
stated in the bill of lading, but by the schedules and
tariffs in effect on the date when the bill of lading is
issued. It is also clear that the agreement to pay the
proper freight charges is embodied in and is a part
of the bill of lading, because it specifically recites that
the shipment is received subject to the classifications
and tariffs in effect on the date of the issue of the
original bill of lading, this statement evidently refer-
ring to the classifications and tariffs mentioned in the
decisions just cited, and to which the shipper agreed
for itself and its assigns or transferees. According
to the terms of the bill of lading the shipper agreed,
for itself and its assigns or transferees, that the owner
or consignee should pay the freight,—not necessarily
the specific rate stated in the bill of lading, for that
rate might be erroneous and in that contingency the
agreement would be void, but the legal rate of freight
as fixed by the schedules and tariffs as aforesaid.
Such tariffs are a part of the bill of lading, and, there-
fore, a part of the written contract between the par-
ties. *Chicago, Rock Island & Pacific Ry. Co. v.
Cramer,* 232 U. S. 490 (34 Sup. Ct. 383, 58 L. Ed. 697).''

The respondent cites the case of *Spokane County v.
Prescott,* 19 Wash. 418, 53 Pac. 661, 67 Am. St. 733,
as maintaining the principle that the action is one
founded upon the statute rather than upon a contract
in writing. That was an action upon the surety bond

of a county treasurer, who had failed to account for moneys received by him as such treasurer. It was brought within six years after the cause of action accrued, but after the statute had run against the liability of the officer to account. It was held that the bond did not give rise to the obligation to account, but was only security therefor, and hence an action could not be maintained thereon after the principal liability was barred. The principle of this case, it seems to us, in no way trenches upon the principle in the case at bar. Here the contract of carriage and the promise to pay the legal charges for the carriage gives rise to the cause of action. In other words, the action is upon the principal, not the collateral obligation. The case is more in line with the cases of *Caldwell v. Hurley,* 41 Wash. 296, 83 Pac. 318, and *Lindblom v. Johnston,* 92 Wash. 171, 158 Pac. 972, than it is with the one cited.

Our conclusion is that the court erred in sustaining the demurrer. The judgment is therefore reversed, and the cause remanded with instructions to overrule the demurrer and require the respondent to answer to the merits.

MOUNT, MACKINTOSH, TOLMAN, MITCHELL, PARKER, and MAIN, JJ., concur.

HOLCOMB, J. (dissenting)—The foregoing discussion is based upon the premise that, since the bill of lading is a contract, and a contract in writing, any action upon the contract, or upon a liability, express or implied, arising out of contract, is within the statute if commenced within six years from the time the cause of action accrued, unless

"the circumstance that the contract does not specifically name the sum to be charged for the carriage, but provides that the sum to be paid shall be the stat-

utory rate, changes the nature of the liability from one on contract, or one arising out of contract, to a liability created by law.''

It is argued that,

''A liability created by statute is one in which no element of agreement entered, but is an obligation which the law creates in the absence of agreement, but the present liability is not of that sort. The law but fixes the rate to be charged when a contract of carriage is made. In other words, the law does not create the liability; it but determines the amount of the liability created by the express contract of the parties. As such, it is not a liability created by statute. It is a liability arising out of the contract which the parties have by their writing expressed.''

The premise is correct, but the reasoning is unsound. At common law the bill of lading was a contract, even though the rate of carriage was not specified therein. Under that system the greatest freedom was enjoyed by ''trade'' in transportation. There was much discrimination, secrecy, subterfuge, rebating and other abuses. These abuses led to the enactment of acts by many states and by the national government to regulate commerce, and by those acts the rates to be charged were perforce removed from the field of private agreement and secret barter and became matters of legal regulation. The entire subject of rates is removed from the realm of private contract. The regulation thereof in this state is very similar to that of the Federal government, and the principles applicable are identical. Under these statutory regulations the shipper obtains transportation by right of law equal with every other shipper of the same class, and the rate charged is not the result of private contract, either written or oral, unless the carrier shall have failed to file and post a proper schedule, but is fixed and determined under recognized legal forms.

These statutes, ours as well as the Federal government's, ignore the bill of lading and make the published tariff rate binding, and subject both the carrier and the agent to severe penalties for the infraction thereof. *Gulf, Colorado & S. F. R. v. Hefley,* 158 U. S. 98.

"After the tariff rates have been duly established, as provided by law, the rate on any given shipment ceases to be a matter of negotiation between the parties. The carrier is then required by law to render a service for the public, and the established charges are enforceable, not by reason of any contract, but by virtue of the law that fixes the rates." *Baltimore & Ohio S. W. R. Co. v. New Albany Box & Basket Co.,* 48 Ind. App. 647, 94 N. E. 906, 96 N. E. 28.

See, also, *Fisher v. Great Northern R. Co.,* 49 Wash. 205, 95 Pac. 77.

If these principles do not establish a legal duty and, correlatively, a legal liability, regardless of any written contract, it would be difficult to understand where would lie the case which does. No voluntary contract can be made by parties when the obligation is fixed by law. The parties can in no way modify, enlarge or diminish the statutory obligation. Such being the case, the cause of action did not fall within our six-year statutory period of limitation, but rather under the two-year provision; certainly it would be barred by the three-year provision. And we have held in numerous like instances, such as in an action upon a county officer's official bond for malfeasance in office, where the plaintiff, in answer to the statute of limitations, claimed that, since the bond was a written contract, the period of limitation was six years, that the obligation sued upon was one created by law, and hence not contractual; and the fact that it was a written contract, imposing the same but no other or different obligation, did not change the cause of action

from one arising from operation of law to a written contract, and so come within the six-year period of limitations. *Spokane County v. Prescott,* 19 Wash. 418, 53 Pac. 661, 67 Am. St. 733.

See, also, *Schreiner v. Emel,* 26 Wash. 555, 67 Pac. 228; *Johnson Service Co. v. Aetna Indemnity Co.,* 46 Wash. 434, 90 Pac. 590; *Kepl v. Fidelity & Deposit Co.,* 81 Wash. 135, 142 Pac. 489.

Under the laws of this state, a bill of lading issued by a carrier to a shipper is nothing more than a receipt for the goods, and a contract to carry and deliver them, and has nothing to do with the rates or the liability arising under the charge for carriage.

The circuit court of appeals, eighth circuit, in *Chicago & N. W. R. Co. v. Ziebarth,* 245 Fed. 334, held that an action by a carrier against a shipper for an undercharge on an interstate shipment was an "action upon a liability created by statute, although the liability is in the nature of a specialty," in so far as the statute of limitations is concerned, and that the state statute of limitations applied.

For the foregoing reasons, I am obliged to dissent.

CHADWICK, C. J., concurs with HOLCOMB, J.

ON REHEARING.

[*En Banc.*   November 3, 1919.]

PER CURIAM. — Upon a rehearing *En Banc,* the majority of the court adhere to the opinion heretofore filed herein, and for the reasons there stated, the judgment is reversed and the cause is remanded with instructions.